IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Alfred L. Papillon,                       ) | Civil Action No. 6:15-2227-RBH-KFM |
|           Plaintiff,   ) | |
| vs.                  ) | **REPORT OF MAGISTRATE JUDGE** |
| Carolyn W. Colvin, Acting     ) Commissioner of Social Security,   ) | |
|        Defendant.  ) | |

This case is before the court for a report and recommendation pursuant to Local Civil Rule 73.02(B)(2)(a) (D.S.C.), concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).

The plaintiff brought this action pursuant to Section 205(g) of the Social Security Act, as amended (42 U.S.C. 405(g)) to obtain judicial review of a final decision of the Commissioner of Social Security denying his claim for disability insurance benefits under Title II of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

The plaintiff filed an application for disability insurance benefits ("DIB") on July 22, 2010, alleging that he became unable to work on May 5, 2005. He later changed his disability onset date to January 1, 2008. The application was denied initially and on reconsideration by the Social Security Administration. On May 12, 2011, the plaintiff requested a hearing. The administrative law judge ("ALJ"), before whom the plaintiff appeared at a hearing on February 9, 2012, considered the case *de novo* and, on March 19, 2012, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended. The ALJ's finding became the final decision of the Commissioner of

Social Security when the Appeals Council denied the plaintiff's request for review on July 30, 2013.

On September 19, 2013, the plaintiff filed an action in this court for review (6:13-2555-RBH-KFM).   On June 18, 2014, the case was remanded to the ALJ to review additional evidence on motion of the Commissioner (Tr. 1191-94).  The ALJ considered the additional evidence and on February 9, 2015, issued a new decision finding that the claimant was not disabled from January 1, 2008, to September 30, 2008, the date last insured (Tr. 1155-61). The plaintiff then filed this action for judicial review.

In making the determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

> (1)  The claimant last met the insured status requirements of the Social Security Act on September 30, 2008.
>
> (2)  The claimant did not engage in substantial gainful activity during the period from his amended onset date of January 1, 2008, through his date last insured of September 30, 2008 (20 C.F.R. § 404.1571 *et seq*).
>
> (3)   Through the date last insured, the claimant had the following severe impairments:   lumbar degenerative disc disease and cervical degenerative disc disease status-post fusion (20 C.F.R. § 404.1520(c)).
>
> (4)  Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526).
>
> (5)  After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform the full range of medium work as defined in 20 C.F.R. § 404.1567(c).
>
> (6)  Through the date last insured, the claimant was capable of performing past relevant work as an office clerk, emergency medical service office manager, and digital data technician. This work did not require the performance fo work-related

activities precluded by the claimant's residual functional capacity (20 C.F.R. § 404.1565).

(7) The claimant was not under a disability, as defined in the Social Security Act, at any time from January 1, 2008, the amended onset date, through September 30, 2008, the date last insured (20 C.F.R. § 404.1520(f)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment. 20 C.F.R. § 404.1520. If an individual is found not disabled at any step, further inquiry is unnecessary. *Id.* § 404.1520(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62, 1982 WL 31386, at *3. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy that the plaintiff can perform despite the existence of impairments that prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. See *Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

4

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that the conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

The plaintiff was 55 years old on his alleged disability onset date (January 1, 2008) and 56 years old on his date last insured (September 30, 2008). He has past relevant work experience as an office clerk, emergency medical service office manager, and digital data technician (Tr. 1160). The plaintiff has a college education having attended the University of Montana where he received a Bachelor of Science degree in Forestry (Tr. 127-28, 443).

The plaintiff served in the United States Navy from May 1973 through September 30, 1994. He subsequently filed for compensation and pension from the United States Department of Veterans Affairs ("the VA"), with some impairment ratings as early as 2003. As of some point prior to March 25, 2005, he had a combined impairment rating of 80% (Tr. 198, 210-12). The plaintiff also worked as an office clerk at Glacier National Park (Tr. 133, 151). He was later employed by the Department of Agriculture as a digital data technician before moving to an emergency service organization, where he worked in administration as an office assistant (Tr. 151). The plaintiff states that he was laid off from this job (his most recent employment) for reasons unrelated to physical/mental impairments and/or alleged disability (Tr. 127, 148). The plaintiff applied for veterans' disability payments soon thereafter and has been collecting benefits due to service-connected disabilities since February 2005 (Tr. 443, 1160). The plaintiff's alleged date of disability submitted to and approved by the VA predates the plaintiff's purported disability onset date alleged to the Social Security Administration by approximately three years (Tr. 198, 1160).

5

In October 2010, the plaintiff completed a function report in connection with his DIB application (Tr. 142-49). In the report, the plaintiff stated that he prepared his own meals every day, performed various household chores independently (e.g., laundry, house cleaning, dish washing, etc.), attended to his personal care needs, took care of his dog, left his house regularly and without assistance, walked, drove his car, performed his own shopping, and handled his finances without assistance (*id*.). The plaintiff noted that he attended church regularly and spent leisure time reading, watching television, and performing various computer projects (Tr. 146). In reference to alleged mental impairments, the plaintiff denied potential attention deficit issues, reported that he had no difficulty finishing what he started (i.e., chores, reading, movies, conversations, etc.), and denied any issues following instructions or getting along with authority figures (Tr. 147-48). According to the plaintiff, he also handled typical changes in routine well and without issue (Tr. 148). The plaintiff noted that although he was prescribed a back brace in 1996, he rarely used it (*id*.).

### Medical Evidence

Records from the VA Colorado Health Care System show that by at least as of July 29, 2004, the plaintiff's medical history included spondylolisthesis/cervical stenosis, low back pain, asthma, depression, and irritable bowel syndrome. The pulmonary service note provides a history of asthma for many years. The primary symptom was cough-nonproductive, which typically occurred with exercise or stress. He had been to the emergency room several times for the symptoms. He used an Albuterol inhaler which worked after about 45 minutes to an hour (Tr. 270).

On July 30, 2004, the plaintiff underwent anterior cervical discectomy and fusion at C4-5 and C5-6, as a result of a history of neck pain that had progressed with left upper extremity weakness (Tr. 247). A cervical spine x-ray on August 2, 2004, confirmed

6

fusion at C4-5-6, lordosis, mild focal kyphosis at C3-4, and extensive pre-vertebral soft tissue swelling (Tr. 238).

On February 3, 2005, Jonathan Anderson, M.D., of Big Sky Family Medicine provided a statement summarizing the plaintiff's medical history and the current functional problems (Tr. 519). Dr. Anderson cited a long history of low back problems originally diagnosed as spondylolisthesis grade I in the 1980s that had progressed to a grade II with a recent MRI on July 8, 2004, with severe biforaminal narrowing. Dr. Anderson further stated:

> He continues to have disability secondary to the low back problem with the range of motion, stiffness, and difficulty walking more than two blocks before having to stop secondary to his pain with his maximal lifting capacity between 20 to 30 pounds before pain sets in. He is only able to sit 20 minutes at a time before he needs to stand and move around. He is occasionally having dyesthesias in his leg with this as well.

(Tr. 519).

On February 25, 2005, Harvey C. Swanson, M.D., with VA Montana conducted an examination for a VA compensation and pension ("C&P") evaluation to determine whether the plaintiff's previously established impairment rating should be increased. It was noted that the plaintiff had shortness of breath with exertion and exposure to cold temperatures. He reported that his difficulties had increased over the past several months. He now got winded going up one flight of stairs. He has cut down on general physical activity to avoid heavy exertion because of this problem. Dr. Swanson determined that the asthma was quite chronic and stable (Tr 521-22).

On March 1, 2005, Dr. Swanson noted that the plaintiff had undergone surgery on July 30, 2004, for cervical spine stenosis. This included an anterior cervical discectomy and fusion at the C4-5 and 5-6 levels. The radicular pain and weakness in his left upper extremity dramatically improved after the surgery, but there had been a gradual

7

relapse of symptoms since then.  He had increased pain in the left upper extremity and a feeling of weakness. This had especially been a problem with fine motor functioning such as grasping.  He described pain that radiated down his left arm and pain with range of motion of the neck. On examination, Dr. Swanson found pain with the last 20 degrees of range of motion of the neck. Dr. Swanson also found radicular pain from the shoulder to the forearm and hand on the left, which the plaintiff said waxed and waned.  Motor strength was normal, but the plaintiff noted that repetitive use would aggravate symptoms (Tr. 522).

Dr. Swanson noted that in the military medical records ("C – file") the plaintiff reported chronic lower pain for a number of years.  A lumbar CT scan in October 2003 revealed spondylolisthesis of L4 and L5 with bilateral pars defects.  This resulted in some bilateral foraminal stenosis at that level.  At this time, the plaintiff reported pain that radiated from the lower back into both legs sometimes worse on the right then left.  He was able to walk about two blocks before the pain became unbearable.  He did not do any repetitive bending or lifting without severe pain.  Range of motion of the lumbar spine showed reduced flexion with pain.  He had pain with extension and lateral bending. In the neurological exam, there was subjective decreased sensation to touch in the feet on the first and third toes bilaterally, more on the left and the right.  He could squat to about 45 degrees before getting too much pain.  Dr. Swanson assessed spondylolisthesis of the lumbar spine with pars defects and foraminal encroachment, with increased symptoms and limitations of physical activity (Tr. 523).

In the examination of the feet, Dr. Swanson saw a large bunion on the big toe of the left foot and a smaller one on the big toe of the right foot.  The plaintiff reported pain on motion of those joints, and pain in the movement of the great toe on both feet from these bunions. Dr. Swanson diagnosed degenerative arthritis of the first MP joints of both feet with decreased range of motion.  The plaintiff confirmed that these problems limited his ability to perform a long standing or walking on hard surfaces, primarily due to pain in his

left foot (Tr. 524). Additionally, he had a history of plantar warts that became very painful with any prolonged standing or walking. Although there were some concerns regarding the plaintiff's knees, it was determined that they were actually a result of chronic radicular pain in his legs related to his back problems.

On March 25, 2005, the VA issued a new rating decision of 100% impairment. The plaintiff was also entitled to individual unemployability benefits. Both of those decisions were effective as of December 28, 2004 (Tr. 198). The ratings accounted for the plaintiff's lumbar spine impairment, cervical spine impairment, radiculopathy, degenerative changes in the right knee and feet, and chronic obstructive pulmonary disease ("COPD")/asthma (Tr. 194-95; 198-99). The rating decision provided detailed explanation and justification for the "unemployability" determination as well as each of the individual impairment ratings (Tr. 200-208).

During a checkup on December 14, 2005, Jonathan G. Bechard, M.D., with the VA Montana Health Care System wrote that the plaintiff's neck still bothered him at times, though Lortab helped. The plaintiff still had residual weakness in his left upper extremity. His depression was not as well controlled, and he wanted to increase his dosage of Celexa (Tr. 302).

On December 28, 2005, the plaintiff told Dr. Bechard that his back had been giving him trouble and preventing him from work. He stated he had to resign from work on December 16 because he could not do it anymore because of back pain. He was off work for several months due to his cervical spine surgery. At this time, his back pain was an 8/10 in severity. His previous job working with county EMS was primarily office work, but it also involved some moderate lifting at times, which he was unable to do. He was interested in seeking a 100% disability because of the lumbar spine. The last C&P evaluation for his lumbar spine was in September 2003. Dr. Bechard commented that the medical staff has not done much to address his lumbar spine as his cervical spine and cervical radiculopathy

9

were his primary concerns for most of last year (Tr. 322).  Dr. Bechard recommended he obtain an updated C&P evaluation and ordered an elastic lumbar support brace for the plaintiff (Tr. 323).

On April 5, 2006, while moving to Louisiana, the plaintiff was admitted to a hospital in Kansas.  During that admission, a CT scan of the cervical spine was conducted. That scan revealed marked degenerative changes in the lower cervical spine and operative changes (Tr. 544).  In April 2006, the plaintiff reported to the clinics with the VA medical center in Alexandria, Louisiana ("VA Alexandria").  He was having continued pain in both sacroiliac areas.  He was taking hydrocodone four times a day and not getting enough pain relief.  His private primary care physician was recommending the use of fentanyl patches (Tr. 561).

In an initial medical evaluation at VA Alexandria on June 22, 2006, problems included asthma, degenerative joint disease with chronic neck and back pain, using Lortab and muscle relaxant, plus aspirin in between the Lortabs; left foot deformity with hammer toes and bunion, and plantar warts on both feet.  He had depression and was to continue Celexa pending mental health consult (Tr. 584-87).

On June 29, 2006, the plaintiff had a psychiatric consultation at VA Alexandria.  He reported that his depression caused him to not be able to complete projects, sleep excessively, and kept him from being productive.  He endorsed feelings of worthlessness.  He stopped Prozac before because of too many side effects.  He had been on Celexa ever since he saw a psychiatrist in Montana four years ago.  His father had dementia, and a brother was in a group home due to schizophrenia.  He was diagnosed with ischemia plus chronic back pain, asthma, and sleep apnea, with a Global Assessment

of Functioning ("GAF") of 68.[1]  It was noted that he did not have a typical endogenous depression.  The medication was not warranted, and his Celexa was to be tapered.  The plaintiff agreed with this (Tr. 713-14).

On August 11, 2006, the plaintiff met with the clinical psychologist at the VA Alexandria.  A psychological examination a month earlier had provided diagnoses of adjustment disorder not otherwise specified, somatoform disorder (rule out noncompliance with medical treatment) and personality disorder.  His GAF was 60.[2]  It was suggested that he take antidepressants (Tr. 567).  Upon medical advice, in June the plaintiff had tapered off Celexa. This resulted in his becoming very irritable.  He was tense and agitated.  He restarted the Celexa (Tr. 569).

In September 2006, the plaintiff's pain was at a level of 6/10 but sometimes reaching 8/10.  The pain was sharp in both hips radiating into both ankles.  It was constant and made it difficult to sleep.  It was made worse by bending, lifting and certain positions of the legs when sitting.  He got partial relief with current medications. The pain interfered with sleep and physical activity and also caused some depression because he could not do what he would like.  He had some history of falling (Tr. 564).

---

[1]A GAF score is a number between 1 and 100 that measures "the clinician's judgment of the individual's overall level of functioning." *See*  Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders*, 32-34 (Text Revision 4th ed. 2000) ("*DSM-IV*").  A GAF score between 61 and 70 indicates some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well. *Id.* The court notes that the fifth edition of the DSM, published in 2013, has discontinued use of the GAF for several reasons, including "its conceptual lack of clarity (i.e., including symptoms, suicide risk, and disabilities in its descriptors) and questionable psychometrics in routine practice." *See* Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders*, 16 (5th ed. 2013) ("*DSM–V*").

[2]A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  *Id.*

In October 2006, at the VA Alexandria, the plaintiff requested to be evaluated for pain management because he was not able to tolerate the Fentanyl patch prescribed by his primary doctor (Tr. 556).

A lumbar spine MRI was conducted on November 1, 2006.  The MRI revealed an approximately 33% anterior listhesis of L4 on L5.  There was spondylosis on the right.  There was decreased T-2 disc signal throughout the lumbar spine and facet hypertrophy of L5-S1 on the left with impingement of the nerve root.  The plaintiff's spinal cord was normal (Tr. 625).

On June 25, 2007, the plaintiff had a physical medicine and rehabilitation consultation at the VA Alexandria medical center.  He was having sharp pain across the low back with radiating pain down the left leg.  Six months before, it had been going down the right side.  He also had numbness down the lateral side. The plaintiff reported left foot drop and a feeling of leg weakness.  He stated he did not want to be on the hydrocodone, which he had been taking for the past seven years.  He was on hydrocodone and Oxycontin until he was weaned off in June 2007.  He had recently started working out in the pool. His goal was to stay away from narcotic medications.  His pain over the past week ranged from 2-5 out of 10, up to 8/10.  The pain was worsened by walking and extended exercises.  Impression of the lumbar MRI from October 30, 2006, was an approximately 33% anterior listhesis of L4 on L5 with spondylolisthesis on the right, facet hypertrophy of L5-S1 on the left with impingement of the nerve root, and degenerative disc disease.  The plaintiff was walking with a steady gait and pace, but straight leg raising was positive.  The plan was to obtain a TENS unit and lumbar therabeads, begin Gabapentin, began a menthol/methyl salcylate cream, and consider other therapies (Tr. 680-81).

In June 2007, physicians at th VA Alexandria ordered a TENS unit with electrodes for the plaintiff, due to his diagnosis of degeneration of intervertebral disc (Tr. 668-69).  On August 30, 2007 at the physical medicine rehab, it was reported that the TENS

unit seemed to be irritating his muscles.  The Gabapentin seemed to be helping some but caused drowsiness occasionally.   The TENS unit was providing little help at this time. Straight leg raising was positive (Tr. 682).

X-rays of the plaintiff's feet were taken on June 25, 2007, because of bunions with pain in both feet.  The left foot demonstrated hallux valgus deformity.  It was more pronounced than on the right.  Degenerative joint disease changes were also present in the first and second toes.  There was a deformity suggesting possible previous fracture or injury to the proximal phalanx of the second toe, with flexion deformities also noted in second and third toe (Tr. 621).  The right foot demonstrated moderate hallux valgus deformity with DJD at the base of the distal phalanx of the big toe.  Flexion deformities were also seen in the second, third, and fourth toes.  The plantar angle was slightly flattened (Tr. 622).

On June 28, 2007, the plaintiff was examined by Robert M Butler, M.D., a podiatrist with VA Alexandria.  The plaintiff reported having minor bunions since he had been in his 20s.  Those on his left foot had been getting worse for past several years.  The big toe was deviating, and the second toe was following.  He did not have pain with this; instead the area was "entirely numb."  Also he stated that the left foot dropped frequently, and occasionally the toes hit the ground, but he denied falling. On examination, Dr. Butler found that the pedal pulses were present PTA bilaterally and DPA were absent.  Doppler sounds were heard, but they were very loud and abnormal.  Dr. Butler went on to describe abnormalities in the shape and function of the big toe and second toe.  The assessment was bilateral bunions with Hallux Valgus of the left much greater than right.  Both were characterized as asymptomatic because the feet were numb. Dr. Butler also noted that the impingement of the low back nerve roots had secondary effects of the feet.  The increasing left foot deformity was probably at least in part due to the patient's back (Tr. 676).  Dr. Butler discussed with the plaintiff that he could provide a splint or a cane to use to help with the foot drop or support him should he start to fall.  The plaintiff declined at that time.

13

Surgery was discussed, but Dr. Butler recommended a conservative approach since at this point he did not have pain (Tr. 675).

A lumbar MRI was performed on July 26, 2007. The lower levels of the plaintiff's thoracic spine were noted to have degenerative discs and bony changes. At L1-L2, there was a broad-based posterior disc bulging with abnormal signal within the annulus, consistent with a tear. It was noted that there may be a subligamentous herniation present. At L2-L3 and also L3-L4, there were minor degenerative changes with no evidence of ruptured or herniated disc and no foraminal or spinal stenosis. However, L4-L5 "demonstrates prominent changes," with bilateral spondylolisthesis of L4 with a 1.4 cm listhesis of L4 on L5. Although there was no evidence of spinal stenosis, there was narrowing of both intervertebral foramina (Tr. 597-98).

In July 2007, physicians at the Alexandria VAMC ordered four splints (Tr. 667). Custom shoes were requested by the VA orthotics in September 2007. The orthopedist noted that the plaintiff had bunions on both feet with the left being the worst. He had a larger red area on the left bunion from his shoes. He also had hammer toes on both feet. He was cast for the custom shoes (Tr. 672).

On October 4, 2007, the plaintiff contacted the physical rehabilitation clinic and stated that his TENS unit did not help very much. He also wanted to discuss the use of the medication Suboxone, which he had received from a private physician to try to get him off of Hydrocodone. His pain ranged from 1/10 to 5 or 6/10. A prescription was issued for Tramadol 50 mg twice daily as needed. There was concern about potential side effects and interaction with Celexa, and the plaintiff noted that he would switch antidepressants if needed (Tr. 720).

An x-ray of the plaintiff's lumbar sacral spine on October 30, 2007, demonstrated chronic spondylolisthesis of L5 bilaterally with surrounding sclerosis. This was associated with Grade 2 spondylolisthesis of L5-S1. The L5-S1 intervertebral disc was

14

almost completely obliterated with marked sclerosis of the endplates and prominent anterior osteophytes at S1.  The facet joints in the lower lumbar spine were narrowed and sclerotic suggestive of degenerative joint disease.  There was early disc space narrowing in the lower thoracic spine to L2.  The impression was moderately advanced Grade 2 spondylolisthesis of L5-S1 with chronic spondylosis of L5 bilaterally (Tr. 624).

A private physician, James McNally, M.D., served as the plaintiff's primary care physician from September 2006 through December 2007.  In the last office visit notes dated December 2007, the plaintiff reported having headaches behind his left eye for the past two months, which were getting worse.  Dr. McNally's overall impressions were sinusitis, degenerative disc disease, and spondylolisthesis (Tr. 640).  In total, the plaintiff had 16 visits with Dr. McNally (averaging about once a month), always with back pain and other symptoms (Tr. 640-58).

In the spring of 2008, the plaintiff moved to the Charleston, South Carolina area, and began receiving treatment at the Ralph H. Johnson VA Medical Center ("VA Charleston").  On July 30, 2008, the plaintiff reported that for the last six months he had been having several symptoms from his depression including trouble concentrating and focusing, feeling anxious, increased need for sleep, and short temper.  He had been taking medication for depression and a sleep aid, but they did not seem to be helping. A consultation with mental health was planned (Tr. 406, 470).

At the initial visit to the mental health clinic on August 6, 2008, it was noted that the plaintiff had outpatient mental health treatment at the VA in both Louisiana and Montana.  They had tried Prozac, but that did not work.  His current medication was not working well.  He was concerned that he may have attention deficit disorder particularly with difficulties with concentration, focusing, and staying on task (Tr. 407).  The plaintiff's pain score was 5 and described as continuous pain in the buttocks, back, and neck. The plaintiff reported that at times his pain level exceeded 5 and could reach levels of up to 7-8 on a

15

1-10 scale (Tr. 409).  Assessment included irritability, lack of energy and motivation, memory issues, isolating, and unable to complete task.  His mood was depressive.  His spouse had attended the session and agreed that his behavior had become increasingly different since they moved to South Carolina. Symptoms of hostility and irritability had escalated within the last 2 to 3 months (Tr. 411).

On August 26, 2008, the plaintiff had his first visit with a psychiatrist at the VA Charleston, Emily R. Goddard, M.D.  He was diagnosed with adjustment disorder, somatoform disorder (not otherwise specified), and personality disorder, not otherwise specified, with obsessive-compulsive personality disorder ("OCPD") traits.  Additionally, current medical problems included headaches, asthma, cervical surgery, obstructive sleep apnea, spondylolisthesis, and low back pain.  The plaintiff's GAF was assessed as 65 (Tr. 463).

On September 4, 2008, the plaintiff's mental health treatment goals continued to be to increase his functional level by modifying his energy level and motivation and to decrease mood disturbance from depression.  Diagnosis continued to be adjustment disorder, somatoform disorder, and personality disorder with OCPD traits (Tr. 458-59).

Dr. B.G. Quesenbery, Jr., Ph.D., a psychologist, conducted diagnostic interviews with the plaintiff on November 17 and 21, 2008.  The presenting problem was that the plaintiff was not getting anything done.  He said he was distracted and did not finish what he starts. Dr. Quesenbery concluded that the plaintiff was coping with ADHD (combined type) and showing clinical signs of depression and high level of anxiety.  Dr. Quesenbery recommended a trial of medication help with his ADHD symptoms of inattentiveness and impulse control. Counseling was also recommended (Tr. 767-87).

The plaintiff visited his primary care physician at the VA, Arthur P. Wolinsky, M.D., on December 1, 2008.  He continued with low back pain, with no lumbar surgery or injections. He had previously used Tramadol, but had to stop because of an interaction with

16

Bupropion.  Now that his Bupropion had been changed, he could go back to the Tramadol.

It was agreed that an updated MRI was not needed.  Dr. Wolinsky also confirmed it was

okay for the plaintiff to exercise in a gym.  The plaintiff also was having headaches, part of

which were coming from his neck.  He was on Albuteral and Singulair for his asthma.  His

asthma was mainly exercise induced (Tr. 429.)

On December 10, 2008, cervical pillow was ordered for neck pain (Tr.

383-84).  Dr. Wolinsky specified he needed a cervical pillow that would not cause much

forward flexion of the neck (Tr. 398).

### Administrative Hearing

During the hearing on February 9, 2012, the plaintiff's attorney pointed out

that the VA had found the plaintiff to be 100% disabled since 2005 and asked the ALJ to

give that finding "serious consideration" (Tr. 35).

The plaintiff first described low back pain going down both of his legs. He had

an area in the top of the right leg that was numb.  He had also required cervical spine fusion

surgery to treat pain going down his left arm into the index in the finger, the first finger and

thumb.  After the surgery, he had attempted to return to his work at the Flathead County

EMS in November 2004.  But at the end of January, he had to submit his resignation

because he was not physically able to do the job anymore (Tr. 37, 189).  He had not been

able to work at all since then.

The plaintiff further explained that his low back problems started while he was

in the Navy in 1988.  He was able to tolerate it for several years, but it degenerated to the

point that by 2004 in combination with the cervical spine surgery, it took him completely out.

It was mainly on the right side.  The pain went all the way to the ankle. He was never pain

free although he had gotten used to it for short periods (Tr. 38).

With regard to the neck pain and cervical spine surgery, it was still difficult for

him to move his neck quickly in either direction left right and it hurt.  He continued to have

some pain and numbness in his left arm.  If he was sitting at a table or desk and had to look down at the table for more than about five minutes then he would start having pain especially with tightness on the left side of his neck and the back of the neck and then it would continue to progress.  It could also start a headache (Tr. 39).

The plaintiff could use a computer for about 10 to 15 minutes at a time, and then he would have to get up and walk or lay down or put his feet up because of the back pain.  He would have to lay in a recliner for about 10 to 15 minutes before he could resume (Tr. 40).

Although he testified that he could sit for a little while at a table, the plaintiff spent five to six hours a day in his recliner.  He would sometimes go to bed, take medication, or do physical therapy exercises.  Relief would only last ten minutes to half an hour (Tr. 42-43). He was not always able to sleep in his bed.  The best place for his back was flat on the floor.  He would have to sleep this way at least 2 to 3 times a month, even after buying new beds (Tr. 43).

The plaintiff explained that his asthma had been diagnosed as exercise-induced.  It was also aggravated by stress and chemicals.  For example, he could not use typical bathroom cleaning products such as those containing chlorine or strong odors.  His asthma could also pick up from the stress of too many items to do or paying bills or trying to meet deadlines.  He had to stay focused on one thing at a time and get it finished before he went to something else.  Trying to multitask did not help his back or the asthma (Tr. 40-41).

The plaintiff testified that he had been diagnosed with depression in 2006. This was because of his inability to get a job, his wife's deteriorating health from diabetes and lupus resulting in her death in 2010, his brother dying of cancer in 2007, and another brother dying just a year before the hearing (Tr. 41).  As a result, he testified he had no real

energy.  He was unable to keep his concentration on things.  He was also diagnosed with attention deficit disorder (Tr. 43-44).

The plaintiff had been treated by Dr. McNally for about a year and a half (Tr. 44-45).  He had been going to mental health specialists at the VA for several years now (Tr. 45).  He testified that he had the symptoms even when he did take the medications the way the doctors told him to.  He also had side effects. Oxycodone and Percocet started causing problems with his liver and so they had to discontinue the Tylenol and use only Oxycodone.  The Oxycodone caused sleepiness, though he had gotten somewhat used to it.  The inhalers caused him to be very nervous.  He had to try several different inhaler medications to find one that he can somewhat tolerate.  His doctors had been continuing to try various medications to try to give him some relief (Tr. 45-46).

The plaintiff explained that in 2008 he was having difficulty with his knees being very stiff and cracking.  It was difficult stoop down and if he did get down, he had to have help to get up (Tr. 46-47).  He could attend the monthly meetings of the Knights of Columbus and sit and walk around when he was able to.  However, he was limited in participating in some of the ceremonies.  He got help from other people (Tr. 47-48).

The plaintiff testified that if he had been offered a job in 2008 just at a customer service call center, he would not have been able to do that type of job. He would have difficulty with sitting for long periods of time and staying on the computer (Tr. 48-49).  He would not be able to do any of the other jobs he had, even simple jobs, because of the amount of time he has to spend in a recliner or lying down (Tr. 49).

The plaintiff explained that he had tried a TENS unit, but it did not help, and it made him nauseated.  He was considered a couple of times for surgery but was told that the result would probably be about the same as he is now and at best only a little better (Tr. 50-51).  He had the surgery on his neck in July 2004 because he had no alternative.  The surgery helped some of the pain, but did not reduce the amount of pain in the left hand and

fingers.  The plaintiff told the ALJ that he still drops things with his hands such as a cup of coffee.

The plaintiff testified that he did drive a car, maybe 5 miles a week to get groceries and back.  The furthest he had driven in a while was about 5 miles (Tr. 51-52). The plaintiff noted that medication had not really helped, and he was now in with therapy with a social worker at the VA (Tr. 52).

## ANALYSIS

The plaintiff argues that the ALJ erred by (1) failing to find that his feet and knee issues, asthma, and depression were severe impairments at step two of the sequential evaluation process; (2) failing to properly evaluate the medical opinion evidence of record; (3)  failing to make complete residual functional capacity ("RFC") findings; (4) failing to make proper step four findings as to his past relevant work; and (5) failing to find him disabled under the Medical-Vocational Guidelines ("the grids") (pl. brief at 19-31).  The relevant period for consideration is from January 1, 2008 (the plaintiff's amended alleged disability onset date) to September 30, 2008 (his date last insured) (Tr. 1160-61).

### *Step Two*

The plaintiff argues that the ALJ erred in failing to find that his feet and knee issues, asthma, and depression were severe impairments at step two of the sequential evaluation process. A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c).  Pursuant to SSR 96-03p, "[A]n impairment(s) that is 'not severe' must be a slight abnormality (or a combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities."  1996 WL 374181, at *1.

Here, the ALJ found that the plaintiff had two severe impairments: lumbar degenerative disc disease and cervical degenerative disc disease status-post  fusion (Tr. 1157).  The Commissioner argues that because the ALJ found the plaintiff did have severe

impairments and proceeded through the sequential evaluation, there is no error (doc. 14 at 15-16). An error at step two may be rendered harmless if "the ALJ considers all impairments, whether severe or not, at later steps." *Robinson v. Colvin*, No. 4:13-cv-823-DCN, 2014 WL 4954709, at *14 (D.S.C. Sept. 29, 2014) (citing *Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008)). *See also Washington v. Astrue*, 698 F. Supp. 2d 562, 580 (D.S.C. 2010) (holding that there is "no reversible error where the ALJ does not find an impairment severe at step two provided that he or she considers that impairment in subsequent steps"). However, here, the ALJ did not discuss the plaintiff's feet and knee issues, asthma, and depression at all in the decision at issue[3] (*see* Tr. 1155-61).

The Commissioner further argues that the medical evidence regarding these impairments during the relevant time period reveals that they are not severe (doc. 14 at 17-18). However, the Commissioner's argument is *post-hoc* rationalization not included in the decision. *See Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir.2003) ("[G]eneral principles of administrative law preclude the Commissioner's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ."). Furthermore, when, as here, a claimant has more than one impairment, the ALJ must consider the severe and nonsevere impairments in combination in determining the plaintiff's disability and "must adequately explain his or her evaluation of the combined effects of the impairments." *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). The ALJ's duty to consider the combined effect of the plaintiff's multiple impairments is not limited to one particular aspect of its review, but is to continue "throughout the disability determination process." 20 C.F.R. § 404.1523.

---

[3]The ALJ did discuss the plaintiff's depression in the March 2012 opinion (Tr. 20-21). However, as discussed above, the case was remanded for consideration of additional evidence, and, in the opinion issued in February 2015 that is now before the court, the ALJ did not mention the plaintiff's depression (*see* Tr. 1155-61).

With regard to the plaintiff's feet, in the six months prior to the relevant period, x-rays were done on June 25, 2007, because of bunions with pain in both feet. The left foot demonstrated hallux valgus deformity. Degenerative joint disease changes were also present in the first and second toes. There was a deformity suggesting possible previous fracture or injury to the proximal phalanx of the second toe, with flexion deformities also noted in second and third toe (Tr. 621). The right foot demonstrated moderate hallux valgus deformity with DJD at the base of the distal phalanx of the big toe. Flexion deformities were also seen in the second, third, and fourth toes. The plantar angle was slightly flattened (Tr. 622).  On examination by a podiatrist on June 28, 2007, the big toe was deviating and the second toe was following. The plaintiff did not have pain with this; instead the area was "entirely numb." Also, the plaintiff stated that the left foot dropped frequently, and occasionally the toes hit the ground, but he denied falling.  The pedal pulses were present PTA bilaterally, and DPA were absent. The doctor also noted that the impingement of the low back nerve roots had secondary effects of the feet. The increasing left foot deformity was probably at least in part due to the patient's back (Tr. 676). In July 2007, physicians at the Alexandria VAMC ordered four splints (TR 667). Custom shoes were requested by the VA in September 2007 (Tr. 672).

With regard to the plaintiff's depression, on July 30, 2008, which is during the relevant period, he reported that for the last six months he had been having several symptoms from his depression including trouble concentrating and focusing, feeling anxious, increased need for sleep, and short temper. It was noted that his medication was not helping.  A consultation with mental health was planned (Tr. 406, 470). At his initial visit to the mental health clinic, it was noted that the plaintiff had outpatient mental health treatment at the VA in both Louisiana and Montana. They had tried Prozac, but that did not work. His current medication was not working well. He was concerned that he may have attention deficit disorder particularly with difficulties with concentration, focusing, and

staying on task (Tr. 407). At a visit with psychiatrist Dr. Goddard in August 2008, he was diagnosed with adjustment disorder, somatoform disorder (not otherwise specified), and personality disorder, not otherwise specified, with OCPD traits (Tr. 463). Also, in November 2008, shortly after the relevant period, psychologist Dr. Quesenbery concluded that the plaintiff was coping with ADHD (combined type) and showing clinical signs of depression and high level of anxiety (Tr. 767-87).

      With regard to his knees, the plaintiff explained that in 2008 he was having difficulty with his knees being very stiff and cracking. It was difficult to stoop down, and if he did get down, he had to have help to get up (Tr. 46-47). In the VA rating decision, the degenerative changes to the plaintiff's knees were each rated as 10% disabling, effective December 28, 2004 (Tr. 206-207).

      The medical evidence also shows a long history of asthma (Tr. 270, 463, 521-22, 584-87, 713-14). In December 2008, it was noted that the plaintiff took Albuteral and Singulair for his asthma, which was mainly exercise induced (Tr. 429). The plaintiff testified that his asthma was also aggravated by stress and chemicals (Tr. 40-41). Effective February 25, 2005, the VA rated the plaintiff's COPD/asthma[4] as 30% disabling (Tr. 195, 207-208).

      As noted above, the ALJ found that the plaintiff had the RFC to perform the "full range of medium work as defined in 20 C.F.R. § 404.1567(c)" (Tr. 22). Medium exertional work requires the following capabilities:

    • Sometimes lifting up to 50 pounds;

    • Frequently lifting items weighing up to 25 pounds;

---

[4]In discussing the VA decision finding the plaintiff 100% permanently and totally disabled, the ALJ noted that the plaintiff did not testify to any problems secondary to COPD and found that it was not "a significant impairment" (Tr. 1160). As noted here, in the VA rating decision, the plaintiff's COPD and asthma were evaluated and rated as a combined impairment (Tr. 207-208). The plaintiff did testify at the hearing as to limitations associated with his asthma (Tr. 40-41).

> • The ability to stand or walk for total of six hours out of an 8-hour workday. "In most medium jobs, being on one's feet for most of the workday is critical."
>
> • Use of the arms and hands to grasp, hold, and turn objects.
>
> • Frequent bending, stooping, and crouching, requiring flexibility of the knees and torso.

SSR 83-10, 1983 WL 31251, at *6.

It does not appear that the ALJ considered the evidence regarding the plaintiff's feet and knee issues, asthma, and depression and the impact of such impairments upon his RFC.   Specifically, in finding the plaintiff could perform a full range of medium work, the ALJ did not consider the impact of the plaintiff's mental impairments on his ability to pay attention, concentrate, and focus; he did not consider the plaintiff's asthma in assessing exertional and environmental limitations; and he did not consider the plaintiff's bunions and deformities in both feet and knee issues in evaluating the plaintiff's ability to walk, stand, and perform postural movements.

Based upon the foregoing, the undersigned finds that the ALJ erred by failing to consider and evaluate the above-discussed impairments at step two of the sequential evaluation process as well as their impact on the plaintiff's RFC.

### Other Allegations of Error

In light of the court's recommendation that this matter be remanded for further consideration at step two of the sequential evaluation process, the court need not address the plaintiff's remaining allegations of error as they may be rendered moot on remand. *See Boone v. Barnhart*, 353 F.3d 203, 211 n.19 (3d Cir.2003) (remanding on other grounds and declining to address claimant's additional arguments).   On remand, the ALJ will be able to reconsider and re-evaluate the evidence as part of the reconsideration. *Hancock v. Barnhart*, 206 F. Supp.2d 757, 763–764 n.3 (W.D. Va. 2002) (on remand, the ALJ's prior decision has no preclusive effect as it is vacated and the new hearing is conducted *de*

*novo*). Accordingly, as part of the overall reconsideration of this claim upon remand, the ALJ should also consider and address the additional allegations of error raised by the plaintiff, including that the opinion evidence was not properly evaluated (doc. 12 at 19-22); the RFC findings were incomplete (*id.* at 25-30); the step four finding was unsupported (*id.* at 30-31); and that the plaintiff is disabled under the grids (*id.* at 31).

### CONCLUSION AND RECOMMENDATION

Now, therefore, based on the foregoing, it is recommended that the Commissioner's decision be reversed pursuant to sentence four of 42 U.S.C. § 405(g) and that the case be remanded to the Commissioner for further consideration as discussed above.

IT IS SO RECOMMENDED.

s/Kevin F. McDonald
United States Magistrate Judge

September 28, 2016
Greenville, South Carolina

25

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. **Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.** "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (*quoting* Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

**Robin L. Blume, Clerk of Court**
**United States District Court**
**300 East Washington Street — Room 239**
**Greenville, South Carolina 29601**

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).